UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
────────────────────────────────────────

ELISHA CURTIS ROBINSON,

                     **Plaintiff,**

v.                                        01-CV-0103
                                                (NAM/DRH)

FLEETBOSTON FINANCIAL,

                     **Defendant.**
────────────────────────────────────────

APPEARANCES:                                   OF COUNSEL:

Elisha Curtis Robinson, Jr.
*Pro Se Plaintiff*

Mackenzie Hughes LLP                           Peter D. Carmen, Esq.
101 South Salina Street                          Jacqueline B. Jones, Esq.
PO Box 4967
Syracuse, NY 13221-4967
For Defendant

Hon. Norman A. Mordue, D.J.:

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

     Defendant Fleetboston Financial moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in this employment discrimination action. In the amended complaint plaintiff *pro se* Elisha Curtis Robinson,[1] who was employed by defendant as Data Processing Operations and Technology Associate from May 1998 through April 2000, claims that defendant discriminated against him on the basis of race and because he had a felony

───────────────────────

[1] Defendant served plaintiff with a "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion" in connection with its motion for summary judgment.

conviction. Construed liberally, plaintiff's *pro se* pleading advances the following causes of action under 42 U.S.C. § 2000e ("Title VII"): termination of employment based on race; failure to promote based on race; subjection to unequal terms and conditions of employment based on race; subjection to a hate crime based on race; and retaliation for complaining about racial discrimination. Plaintiff further claims that members of defendant's security team were recording his telephone conversations, that defendant retaliated against him for blowing the whistle on illegal wire transfers, and that defendant discriminated against him because of his felony conviction.

## II.     BACKGROUND

In support of its motion, defendant submitted plaintiff's deposition testimony and affidavits from three of its employees. Plaintiff submitted an affidavit in opposition to the instant motion. The following facts are undisputed unless otherwise noted. Defendant hired plaintiff in May 1998 as a Data Processing Operations and Technology Associate ("DPOT") in the tape library in Fleet's O&T Command Center in Albany, New York. Plaintiff testified that he disclosed his felony conviction during his interview for the position. Plaintiff reported to Robert Morin, the second shift manager, and to Edward Glenning, the Command Center Manager.

On September 1, 1999, plaintiff confronted two Command Center employees, John Sutton and Eligio Rodriguez, and accused them of conspiring to withhold his overtime pay. Plaintiff pointed angrily at them, yelled, and accused them of conspiring against him. Sutton and Rodriguez reported plaintiff's behavior to Morin, plaintiff's supervisor. Morin asked plaintiff to describe the incident. Plaintiff became insubordinate and used foul language.

Disturbed by plaintiff's behavior, Morin contacted Fleet's human resources representative. Morin and the human resources representative decided that plaintiff's behavior toward Morin, Sutton, and Rodriguez warranted a "Step 3" disciplinary warning as part of defendant's "Progressive Discipline" process. Morin administered the warning to plaintiff on September 2, 1999, and explained that the Step 3 warning rendered plaintiff ineligible to apply for any internal jobs for a period of six months. In an affidavit, plaintiff asserts that neither Morin nor anyone else told him that he would be ineligible for a promotion for six months.

In an affidavit, plaintiff states that he complained to Morin that Rodriguez and Sutton conspired to withhold his overtime pay. According to plaintiff, Morin was responsible for submitting time sheets, and violated company policy by allowing two subordinates to complete that task. Plaintiff avers that Morin should have contacted plaintiff's human resources representative about his allegations, as "set forth in the employee handbook." Plaintiff further avers that he believes "that the matter was never investigated and was racially motivated due to our past history of racism." Plaintiff explains that in 1982, he and Morin, who attended the same high school as plaintiff, had a physical confrontation because Morin called him a "nigger".

Plaintiff states that on September 21, 1999, he was the victim of a hate crime. According to plaintiff, Robert Murnane "put either feces, urine, or both in a cup of coffee I left unattended while mounting some tapes in the tape library. When I returned from mounting the tapes Murnane replaced the lid on my cup of coffee. If he did not put anything in my coffee why did he replace the lid?" Plaintiff avers that he contracted E Coli as a result. Plaintiff reported the incident to Morin on September 30, 1999. Plaintiff states that Morin failed to

3

contact his human resources representative about his allegations in violation of the employee handbook.  Plaintiff believes "the matter was never investigated was [sic] racially motivated, due to our past history of racism."  Plaintiff claims that co-workers circulated a report of the incident via the Internet.

Plaintiff testified that one week prior to the coffee incident, David Chriss, who was present when plaintiff drank the coffee, told plaintiff that plaintiff would "be a good soldier in the German Army".  Plaintiff interpreted that to be a racist statement because "[n]iggers didn't like Germans and Germans didn't like Niggers and jews."  Plaintiff complained about the statement to Morin.  Plaintiff claims that Chriss was disciplined as a result and received a verbal warning.

In November 1999, Fleetboston advertised the opening of a DPOT Specialist II position in the Command Center.  This was a "Grade 8" position, and three grades higher than plaintiff's DPOT position.  Plaintiff applied for the position even though the Step 3 warning was still in effect.  Three other employees also applied for the position, John Flowers, an African American male, and David Borden and Patrick Kirch, white males.

Morin interviewed Flowers and Kirch, and met with plaintiff and Borden to explain why he was not considering them for the position.  Morin told plaintiff that his Step 3 status rendered him ineligible for the position under Fleet policy, and that, in any event, he was not qualified for the position because he did not demonstrate enough initiative.

Plaintiff states in his affidavit that Morin "discussed the possibility of a promotion to the DPOT Specialist II position in the mid range area.  This was discussed even though I was on disciplinary action.  I must have been eligible for promotion or Morin would not have discussed

4

this with me."

Sometime after Flowers was interviewed, he received a Step 3 warning, and was, according to defendant, "effectively eliminat[ed]" from consideration for the position. Subsequently, Morin offered the position to Kirch, a security guard. According to Morin, Kirch had a strong work record, showed initiative by working in the tape library on the weekends, had worked for Fleetboston for seven years, and visited the Command Center during his work breaks to learn more about its operations.

Plaintiff claims that sometime after he "did not get this position", the "policy" was changed to provide that there be "'no written disciplinary warnings' since your last review." Plaintiff further claims that human resources did not notify him as to who was promoted, as required by the employee handbook.

In January 2000, plaintiff went to the New York State Division of Human Rights ("NYSDHR") and filed a charge for failure to promote due to race. Plaintiff states in his affidavit that "[s]ince I filed in good faith I was protected from termination."

Plaintiff avers that on February 7, 2000, he called Michele Bolden, the Director of the Office of Diversity, "and told her about being the victim of a hate crime, my overtime delays, and the fact that I was on disciplinary action because of my supervisor Robert Morin who I had racial problems in the past, she failed to investigate."

On February 17, 2000, Lynne Shultis, an employee relations advisor, met with plaintiff to inform him that a female employee had reported that plaintiff repeatedly made unwelcome sexual overtures toward her and that plaintiff had refused her request to cease his conduct. During the meeting, plaintiff admitted that he told the female employee that he "missed her,"

5

that he tried to hang around her work area to be near her, that he had sent her an inappropriate email message, and that he placed a valentine on her knee on February 14, 2000. Shultis told plaintiff that this conduct made the female employee feel uncomfortable, and showed plaintiff defendant's "Freedom From Harassment Policy". On February 23, 2000, defendant issued plaintiff a second Step 3 warning for violating defendant's Freedom From Harassment Policy.

Plaintiff states that on February 28, 2000, he sent an email to "Greg Rice at Corporate H.R. in Boston, detailing the events occurring in my work place. He failed to respond."

On April 24, 2000, defendant terminated plaintiff's employment. In an affidavit, Glenning, the Command Center manager, sets forth the events leading up to defendant's decision to terminate plaintiff's employment:

> [i]n the weeks following the issuance of Mr. Robinson's second Step 3 warning, Mr. Robinson's behavior and, in turn, his performance, did not improve. Rather, his behavior worsened, and his performance further deteriorated. During this time he made unsubstantiated accusations regarding co-workers and supervisors, and his behavior in the workplace became more erratic.
>
> Fleet concluded that Mr. Robinson's behavior was unprofessional, and increasingly threatening, and that he posed a security risk because of his access to sensitive and confidential information of Fleet and its customers.
>
> The unprofessional conduct and threatening behavior demonstrated by Mr. Robinson was in direct violation of Fleet's Workplace Standards Policy and could not be tolerated by Fleet . . . .
>
> Senior management thoroughly reviewed Mr. Robinson's performance, and given Mr. Robinson's ongoing behavior and performance problems, the increased security risk, and the pendency of two Step 3 warnings, on April 24, 2000, Fleet terminated Mr. Robinson.

Below is plaintiff's description of the months leading up to the termination of his employment:

> On March 2, 2000 Mike Frangella made the comment, "who does he think he is, he

6

is going to need a bullet proof vest around here soon". He made this comment in the presence of Rich Giles.

On March 4, 2000 I spoke with my then supervisor Tom Torissi and my new H.R. person Lynn Shultis about this incident, that I no longer felt safe in this building, and I feared for myself and family. Nothing was done.

On March 28, 2000 I spoke with Frank Connelly, Director of Corporate Security, I told him about the illegal wire transfers and how they were being deleted and antitrust violation.

After calling the FBI and NYS Computer Crime Lab and getting no response I went to file a report with the Albany Police Department. On April 3, 2000 I spoke with officer Charles Young about being the victim of a hate crime. He refused to file a report on that basis.

I reported to work on April 24, 2000 and met with Tom Torissi who escorted me upstairs where I med with Ed Glenning, Leigh Arnold, and Frank Connelly. Ed Glenning stated that I was being fired for "nine months of intimidation". I asked them to put this in writing and they refused. Still to this date will not put this reason in writing.

One of plaintiff's allegations is that he was terminated because he reported illegal wire transfers. Plaintiff testified that "Tatayana", "some worker" at Fleetboston, was engaged in illegal wire transfers. Plaintiff stated that he discovered it because he was involved, though he did not know what they were doing was illegal. Plaintiff testified that Tatayana was laundering money for the Russian mafia. Plaintiff averred that he was able to match a tape in the library to a tape identified by number in "the 305 September report of suspicious activity file". Plaintiff reported the suspicious activity to Frank Connelly.

Regarding the allegation that members of defendant's in-house security team recorded plaintiff's phone conversation, plaintiff testified that he knew they were listening to his conversations because his previous employer had used the same phone system. Plaintiff stated that because a green light came on when someone picked up another line on his previous

7

employer's phone system, he believed the security team at Fleetboston was listening to his phone calls because a green light would come on while he was on the phone. Plaintiff testified that he emailed Morin about the situation.

### III.  DISCUSSION

#### A.  Summary Judgment Standard

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id*. If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id*.

"Because direct evidence of ... discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted). A plaintiff must, however, provide more than conclusory allegations of discrimination to defeat a motion for summary judgment. *Id.*

#### B.  Hostile Work Environment

Defendant seeks summary judgment dismissing plaintiff's claim that he suffered race-based employment discrimination in that he was subjected to a hostile workplace. To succeed on this claim plaintiff must establish "(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of

[his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996).  With respect to the first factor, plaintiff must prove both objective and subjective elements, *i.e.*, that the conduct alleged is so severe and pervasive as to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993).  With respect to the second factor, "[w]here an employee is the victim of . . . harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004).

      Plaintiff's deposition testimony and affidavit demonstrate that he perceived the work environment to be racially hostile and abusive based on the delay of his overtime pay, the coffee incident, during which plaintiff claims a co-worker put feces or urine in his coffee, the security team's recording of his phone conversations, and his second Step 3 warning.  Thus, the issue here is whether the evidence would permit a jury to conclude that a reasonable person would perceive the environment to be hostile or abusive based on race.  On a summary judgment motion, the Court must consider the totality of the circumstances and evaluate the quantity, frequency, and severity of the incidents in order to obtain a realistic view of the work environment.  *See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999). Even assuming the truth of plaintiff's allegations, including that a co-worker put feces in plaintiff's coffee, and that plaintiff's phone conversations were recorded, there is no

ground on which a reasonable person could find that plaintiff was subjected to a hostile work environment based on his race. Even incorporating all of plaintiff's allegations regarding defendant's failure to promote him and defendant's termination of his employment, there is no evidence in the record before the Court of any racial comments or any racially motivated behavior. Although plaintiff testified that Chriss, a co-worker, said that plaintiff would "be a good soldier in the German Army", there is nothing about that statement which suggests a racial bias against African Americans. Plaintiff also stated that he believed Morin discriminated against him because of his race, based on a past racially motivated incident between them. That incident, however, occurred in 1982, and is therefore irrelevant. Indeed, plaintiff testified that it was only his "speculation" that led him to conclude the above referenced events occurred because of his race. Considering the totality of the circumstances, the alleged conduct, even if true, cannot reasonably be interpreted as having been taken on the basis of plaintiff's race. Thus, there are no material issues of fact requiring trial and defendant is entitled to summary judgment dismissing plaintiff's hostile work environment claim.

    **C.**    **Title VII Discrimination Claims**

To evaluate plaintiff's Title VII claims, the Court employs the three-step, burden-shifting process articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The first step in the *McDonnell Douglas* formulation requires plaintiff to prove a *prima facie* case of discrimination by the employer. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446-47 (2d Cir. 1999), *cert. denied*, 120 S. Ct. 2688 (2000). To establish a *prima facie* case, plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the action occurred under

circumstances giving rise to an inference of discrimination.  *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999).  The burden of establishing a *prima facie* case is not onerous, *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); indeed, it has been described as "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

In the second step of the *McDonnell Douglas* test, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *See Bickerstaff*, 196 F.3d at 446.  The defendant's burden of production is not a demanding one; it need only offer an explanation for the employment decision.  *See St. Mary's,* 509 U.S. at 507.

The burden then shifts back to plaintiff in the third step of the *McDonnell Douglas* process, to demonstrate that the proffered reason was not the true reason for the employment decision, and that race was the true reason.  *See Bickerstaff*, 196 F.3d at 446.

### 1. Failure to Promote

Plaintiff fails to allege satisfactorily a *prima facie* case on his failure to promote claim.  Although plaintiff is an African American, did not receive the promotion, and defendant offered the promotion to a white male, plaintiff cannot show that he was qualified for the promotion.  Plaintiff does not dispute that defendant gave him a Step 3 Warning on September 2, 1999, effective for six months, and that he applied for the position in or about November 1999.  Although plaintiff claims that Morin did not tell him that he was ineligible to apply for the position due to the Step 3 warning, it is uncontroverted that defendant's Human Resources Policy provides, under the section entitled "Eligibility", that employees "currently under Progressive Discipline, are [not] eligible to bid for an open position."  Morin Aff., Ex.3.  In his affidavit, plaintiff denies that the Human Resources Policy contained that provision at the time

he applied for the promotion, and asserts defendant added that provision sometime after he applied, but fails to cite any evidence in admissible form in support of these otherwise conclusory assertions.

Even assuming plaintiff could establish a *prima facie* case of race discrimination on his failure to promote claim, defendant has offered legitimate, non-discriminatory reasons for hiring Kirch, a white male and not plaintiff.  In his affidavit, Morin states that Kirch received the promotion because Kirch had received a higher performance appraisal than plaintiff, had a strong work record and had been employed by Fleetboston for seven years, had showed initiative by visiting the Command Center on his work breaks to learn more about its operations, had worked overtime in the tape library in a function similar to plaintiff's in an effort to develop relevant work experience.  Morin stated that in contrast, plaintiff demonstrated a lack of initiative because he "squandered his free time by reading the newspaper and talking with friends."  Thus, the burden returns to plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision, and that race was the true reason.  *See Bickerstaff*, 196 F.3d at 446.

Even if plaintiff could demonstrate that defendant's reasons for not promoting him were false, something plaintiff has failed to do, there is no evidence whatsoever that defendant denied plaintiff the promotion because of his race.  Plaintiff states in his affidavit that in 1982, Morin called him a "nigger".  Even accepting this as true, a statement made 18 years ago during high school and never once restated during a four year working relationship, does not an employment discrimination case make.  Indeed, there is no evidence that racial considerations had any impact on Morin's involvement with plaintiff's application for the DPOT II position.

Consequently, there are no issues of material fact requiring trial on this claim. Accordingly, defendant is entitled to summary judgment as a matter of law.

    **2.    Termination**

Although plaintiff can satisfy the first three elements of the required *prima facie* showing, as he is African American, he was qualified for his job, and his employment was terminated, he has adduced no evidence on this motion demonstrating that his termination occurred under circumstances giving rise to an inference of race discrimination. Moreover, defendant asserts it terminated plaintiff's employment because he had received two Step 3 warnings, his performance and behavior following the second Step 3 warning did not improve, and he made unsubstantiated accusations against his coworkers. Thus, defendant has articulated legitimate, non-discriminatory reasons for terminating plaintiff's employment. Plaintiff contends that the accusations he made against his co-workers were well-founded and disputes several of the grounds on which the second Step 3 warning is based, but presents no evidence on which a jury could conclude that defendant terminated his employment based on race. Accordingly, defendant is entitled to summary judgment dismissing this claim.

    **3.    Unequal Terms and Conditions of Employment**

Plaintiff alleges in the amended complaint that defendant subjected him to unequal terms and conditions of employment because of his race. Although plaintiff can establish for purposes of his *prima facie* case that he is African American and that he was qualified for his position, there is no evidence in the record before the Court from which a finder of fact could conclude that plaintiff received unequal terms and conditions of employment, much less evidence that defendant subjected him to such treatment because of his race. Indeed, even

construing this *pro se* plaintiff's pleading and motion papers liberally, there is no discernable basis for this claim. In his deposition, plaintiff admitted that he has no evidence that he received less pay, that defendant denied him a bonus, that he was denied training opportunities, or that his job requirements or work load were affected because of his race. To the extent plaintiff alleges that co-workers delayed his overtime pay because of his race, he admits his allegation is based on his own speculation as to reason for the delay. Even if defendant subjected plaintiff to unequal terms and conditions of employment, there is no basis for any finding by a reasonable jury that plaintiff received such treatment because of his race. Accordingly, defendant is entitled to summary judgment on this claim.

### 4. Hate Crime

One of the claims plaintiff advances in the amended complaint is that defendant subjected him to a race-based hate crime. Specifically, plaintiff contends that Murane put feces or urine in his coffee and that he suffered E Coli as a result. Plaintiff, however, also testified that he did not see Murane put anything in his coffee, and offered no evidence that Murane took that action against plaintiff because of his race. Plaintiff claims that a week prior to the incident Chriss, who was present during the incident, told plaintiff that he would "make a good soldier in the German army." Plaintiff believed this statement to be racial in nature, but absent any evidence from which a jury could find that this comment had racial intent, plaintiff cannot show that his co-workers perpetrated this "hate crime" because of his race. Accordingly, plaintiff has failed to establish a *prima facie* case on this claim.

### 5. Monitoring Phone Calls

To the extent plaintiff claims that defendant's alleged monitoring of his phone calls is an

14

adverse employment action, he fails to establish a *prima facie* case because he offers no evidence that defendant took this action because of his race.

### D. Retaliation

#### 1. Termination of Employment

To establish a *prima facie* case of retaliation, plaintiff must show (1) that he was engaged in a protected activity known to defendant, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998). In the second step of the *McDonnell Douglas* process, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Bickerstaff*, 196 F.3d at 446. The third part of the *McDonnell Douglas* process requires plaintiff to demonstrate that his decision to engage in protected activity by filing a complaint with the NYSDHR regarding employment discrimination – and not the reason proffered by the employer – was the true reason for the adverse employment decision. *Id*.

Plaintiff has shown that he engaged in protected activity by filing a complaint with the NYSDHR in January 2000, alleging that defendant passed him over for a promotion based on his race.[2] Moreover, on February 7, 2000, plaintiff spoke to Michele Bolden, defendant's

---

[2]In a footnote in its memorandum of law, defendant states that "Robinson filed a complaint with the NYSDHR in January 2000, claiming that he was passed over for a promotion based on his race. Robinson filed a second complaint in March 2000, claiming that he was issued a Step 3 written warning for violating Fleet's Freedom From Harassment Policy in retaliation for filing his first complaint." Defendant's Mem. of Law, p.21, n.18. There is, however, no evidence regarding the "March 2000" complaint. Plaintiff avers that in March 2000, he spoke with his supervisor and Shultis about not feeling safe at work, and with Corporate Security about the allegedly illegal wire transfers, but there is no evidence that any of those complaints had to do with the issuance of the February 2000 Step 3 warning.

Director of the Office of Diversity, "and told her about being the victim of a hate crime, my overtime delays, and the fact that I was on disciplinary action because of my supervisor Robert Morin who I had racial problems in the past", and on February 28, 2000, sent an email to Greg Rice at Corporate Human Resources "detailing the events occurring in my work place", including the alleged hate crime.  Plaintiff's employment was terminated on April 24, 2000.  Because plaintiff's burden to establish a *prima facie* case is minimal, the Court will assume the temporal proximity between the January 2000 NYSDHR complaint and the February 2000 complaints plaintiff made to defendant's employees, and the termination of plaintiff's employment in April 2000, is close enough to establish a causal connection.

In an affidavit, Glennings, one of plaintiff's superiors, stated that, "[s]enior management thoroughly reviewed Mr. Robinson's performance, and given Mr. Robinson's ongoing behavior and performance problems, the increased security risk, and the pendency of two Step 3 warnings, on April 24, 2000, Fleet terminated Mr. Robinson."  This statement is sufficient to establish a legitimate, nondiscriminatory reason for the termination of plaintiff's employment.

For his part, plaintiff questions the imposition of the second Step 3 warning, denies telling the female employee repeatedly that he missed her, and claims that he believed that some of his behavior toward the female employee, placing a valentine on her knee, for example, was appropriate because they were friends.  Plaintiff does not, however, otherwise present evidence that calls into question the basis for defendant's decision to terminate his employment.  Further, plaintiff adduces no evidence that retaliation was the real reason.  Although plaintiff complained to law enforcement about the alleged hate crime, plaintiff's last complaint about racial discrimination to someone at Fleetboston was in the form of an email to Rice on February

16

28, 2000. In the absence of any evidence of retaliation other than a two month time period between plaintiff's last complaint and the termination of his employment, there is no basis for a fact-finder to conclude that defendant terminated plaintiff's employment in retaliation for his complaints about race-based discrimination.

### 2. Wire Transfers

Plaintiff claims that defendant terminated him in retaliation for "blowing the whistle on illegal wire transfers." Nothing in the text or legislative history of Title VII, however, indicates that "blowing the whistle on illegal wire transfers" is a protected activity. Plaintiff therefore fails to establish a *prima facie* claim on this cause of action. Accordingly, defendant is entitled to summary judgment.

### E. Felony Conviction

Plaintiff alleges in the amended complaint that defendant discriminated against him based on his prior felony conviction. Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-16. Plaintiff's status as a convicted felon is not protected under Title VII. *Gillum v. Nassau Downs Reg'l Off Track Betting Corp.*, 357 F.Supp.2d 564, 569 (E.D.N.Y. 2005) (finding "the Plaintiff's status as a convicted felon is not a protected class under Title VII."); *Quick v. Runyon*, No. 96 Civ. 0474, 1997 WL 177858, at * 1 (E.D.N.Y. March 25, 1997) ("It is true that criminal history cannot form the basis of a Title VII ... claim."). Accordingly, defendant is entitled to summary judgment as a matter of law on this claim.

### IV. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that defendant's motion for summary judgment dismissing the amended complaint is GRANTED in its entirety; and it is further

ORDERED that the amended complaint is dismissed with prejudice.

IT IS SO ORDERED.

DATE: September 28, 2005

*[signature]*
Norman A. Mordue
U.S. District Judge